IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> GILBERT G. LUNDSTROM, <br><br> Defendant. | 4:14-CR-3136 <br><br> TENTATIVE FINDINGS |

The Court has received the revised presentence investigation report and addendum (RPIR) in this case. The defendant has objected to the RPIR on various grounds (filing 196), and has moved for a downward departure based on his personal circumstances (filing 197).

## I. OBJECTIONS TO RPIR

The defendant was convicted after a jury trial of one count of conspiracy to commit wire fraud affecting a financial institution or securities fraud, one count of conspiracy to falsify bank entries, three counts of wire fraud affecting a financial institution, one count of securities fraud, and six counts of falsifying bank entries. Filing 146.

The defendant has objected to the RPIR on several grounds, including: its calculation of loss caused by the offense conduct; its conclusions that the offense conduct resulted in substantial financial hardship to 25 or more victims, involved sophisticated means, and substantially jeopardized the safety and soundness of a financial institution; and its conclusion that the defendant was an organizer or a leader in committing the offense. Filing 196.

### 1. LOSS CALCULATION

Under U.S.S.G. § 2B1.1(b)(1), where a defendant is convicted of a fraud offense, the offense level depends on the amount of loss caused by the offense conduct. As with other sentencing enhancements, the burden is on the government to prove the loss amount by a preponderance of the evidence. *See*, *United States v. Peroceski*, 520 F.3d 886, 889 (8th Cir. 2008); *United States v. Jackson*, 155 F.3d 942, 948 (8th Cir. 1998). The government alleges two forms of loss in this case: loss to shareholders, and loss to the FDIC.

1

The RPIR concludes that shareholders lost $36,443,123.50 and the FDIC lost $17,171,154.00 as a result of the defendant's fraud—a total of $53,614,277.50 in losses. Accordingly, the RPIR recommends a 22-level increase in offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(L).

The defendant objects to that loss calculation, and the resulting offense level increase, on several grounds. Filing 196 at 3. First, the defendant argues that the government failed to establish the FDIC losses by a preponderance of the evidence, because it failed to prove the losses were attributable to the offense conduct, and because it provided insufficient information about how the loss amount was determined. Filing 196 at 4–7. Second, the defendant objects that the government failed to establish the shareholder loss by a preponderance of evidence, because the method used to calculate the loss failed to distinguish between loss caused by the fraud and loss caused by other factors. Filing 196 at 7–13. The defendant also argues that using the government's method of calculating shareholder loss would violate the *Ex Post Facto* Clause. Filing 196 at 13. Third, the defendant objects to the aggregation of shareholder and FDIC loss to arrive at a loss amount. Filing 196 at 13. Fourth, the defendant proposes that a more appropriate method for calculating loss would be to base it on the defendant's gain. Filing 196 at 14.

The Court directed the government to submit to the Court and the defendant a summary of the evidence it intends to produce on loss, restitution, and forfeiture. Filing 199. In response to the government's subsequent submission, the defendant moved to continue the sentencing hearing. Filing 201. The Court granted the motion and amended the sentencing schedule accordingly. Filing 203. Pursuant to the amended schedule, the government filed its notice regarding the documentary evidence and witnesses it intends to offer at sentencing (filing 206), and the defendant filed a supplemental written statement on loss, restitution, and forfeiture, along with supporting evidence (filings 207 and 208).

(a) Shareholder loss

According to the Guidelines, in a case involving "fraudulent inflation or deflation in the value of a publicly traded security or commodity, the court in determining loss may use any method that is appropriate and practicable under the circumstances." U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). "One such method the court may consider," according to the Guidelines, is a method sometimes referred to as the "modified rescissory" method (MRM). *Id.*; *see United States v. Brown*, 595 F.3d 498, 525 n.30 (3d Cir. 2010).

Under the MRM, the average price of the security in the 90 days following the disclosure of the fraud is subtracted from the average price of

the security during the period in which the fraud occurred. U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). The difference is multiplied by the number of shares outstanding to reach an estimate of the loss caused by the fraud. *Id.* But the Guidelines caution that the Court must determine whether the outcome of this method is "a reasonable estimate of the actual loss attributable to the change in value of the security or commodity." *Id.* In making this determination, "the court may consider . . . the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g. changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events)." *Id.*

### *(i) The government's proposed loss estimate*

The government contends that the Court should apply the MRM in calculating shareholder loss for this case. Filing 206 at 5. According to the government, the fraud period began on September 2, 2008—the date of the modification of the TownesVista loan. *See* filing 206-1 at 3. And it contends that the fraud continued until November 10, 2009—the date that TierOne filed an 8-K disclosing roughly $120 million in previously unreported losses to shareholders. *See*, filing 206-1 at 3; Exhibit 723. Based on these dates, the government's expert witness, Michael Petron, performed the MRM calculation. *See* filing 206-1. First, he subtracted TierOne's average share price[1] in the 90 trading days following November 10, 2009 ($0.74) from the average share price between and including September 2, 2008 and November 10, 2009 ($2.90). Filing 206-1 at 3, 13. He multiplied that difference ($2.16) by 16,950,290—his estimate of the average number of shares outstanding during the purported fraud period.[2] Filing 206-1 at 3–4, 13. He arrived at an estimate of $36,612,626 in loss to shareholders as a result of the defendant's fraud. Filing 206-1 at 4, 13.

---

[1] The average share price for TierOne shares for each period was calculated by taking the mean of the adjusted closing prices of each day within the relevant period. Filing 206-1 at 3. Petron obtained the adjusted closing price data from *TONEQ History Information*, StockMarketWatch, http://thestockmarketwatch.com/stock/stock-data.aspx?stock=TONEQ&A=showHistory (last visited March 10, 2016). Filing 206-1 at 13.

[2] Petron arrived at this estimate by taking the mean of the shares outstanding for each quarter in which the fraud allegedly occurred, weighted by the number of days in each quarter that were part of the purported fraud period. Filing 206-1 at 3–4,13. He obtained the data for the number of outstanding shares from TierOne's 10-K and 10-Q reports. Filing 206-1 at 13. TierOne's final 10-Q was filed on June 30, 2009; Petron assumed that the average number of shares stayed the same during the following two quarters. Filing 206-1 at 13.

*(ii) The defendant's criticisms of the government's loss estimate*

The defendant contends that the government's figure is not a reasonable estimate of the loss caused by the defendant's fraud. Filing 207. The defendant argues that (1) the government fails to account for the difference between the government's estimate of loss under the MRM and its estimate of loss for restitution purposes, (2) the government's calculation fails to account for factors other than the defendant's fraud that caused the share price to decrease, (3) the government used the wrong dates for the period of the fraud and disclosure of the fraud, and (4) the government's use of the number of outstanding shares during the fraud period as a multiplier under the MRM was inappropriate. Filing 207 at 3-7.

First, the defendant points out that there is a sizeable difference between the government's estimate of total shareholder loss caused by the fraud, and the government's calculation of shareholder loss for purposes of restitution—the former amounts to over $36 million, and the latter is roughly $9 million. Filing 207 at 3. The defendant contends that the list of transactions the government used to calculate restitution "contains approximately 90% of *all* transactional data during the government's so-called 'fraud period.'" Filing 207 at 3. Thus, the defendant argues, the two amounts should be closer together, and "the $36 million dollar figure is devoid of reality." Filing 207 at 3.

Second, the defendant argues that the government's calculation fails to account for the losses TierOne suffered as a result of factors other than the defendant's fraud. Filing 207 at 4. These factors can be roughly divided into two categories: (1) external economic factors, including "the industry-wide decline in the banking industry" and "the severe stress on the nation's economy as a whole"; and (2) losses resulting from TierOne's real estate investments. Filing 207 at 4. According to the defendant, "it is *impossible* to reasonably calculate the result of defendant's offense conduct, as opposed to the significant market factors and business decisions at TierOne (made prior to 2008) that led to a decline in TierOne's share value." Filing 207 at 5.

Third, the defendant contends that the government used the incorrect dates for the fraud period in its MRM calculation. Filing 207 at 5. The government chose as its start date September 2, 2008—the date that TierOne agreed to modify the TownesVista loan. Filing 207 at 6. But the defendant argues that there is no evidence he made any fraudulent statements to shareholders—or that he fraudulently omitted to disclose any information to shareholders—until at least May 21, 2009, the date of TierOne's annual shareholder meeting. Filing 207 at 6. Additionally, the defendant points out that at trial, the government repeatedly referred to November 5, 2009 as the date the fraud was disclosed. Filing 207 at 7. In its MRM calculation, the

4

government uses November 10, 2009 as the disclosure date. Filing 207 at 7. According to the defendant, the government "offers no explanation for its change in position." Filing 207 at 7.

Finally, the defendant argues that the government's use of the average number of total outstanding shares as a multiplier in its MRM calculation was inappropriate. Filing 207 at 7. The defendant contends that this number "fails to account for the fact that a significant amount of these shares were not actively traded, including more than 2.7 million shares held by directors and executives at the company." Filing 207 at 7. Thus, the defendant reiterates his position that "performing a loss calculation in this highly complex case is impossible" and that the Court should instead base the calculation on the defendant's gain. Filing 207 at 7.

*(iii) The government's response to the defendant's criticisms*

In response to the defendant's objections to the RPIR, the government asked Petron to analyze the potential effect of general market forces on TierOne's share prices during the relevant periods. Filing 206-1 at 6. To that end, Petron determined that the SPRD S&P Regional Banking ETF ticker (KRE) could be used "as a surrogate for market performance." Filing 206-1 at 6. The KRE "seeks to provide investment results that, before fees and expenses, correspond generally to the total return performance of the S&P Regional Banks Select Industry Index." Filing 206-1 at 6 (quoting *SPDR S&P Regional Banking ETF*, State Street Global Advisors SPDR, https://www.spdrs.com/product/fund.seam?ticker=KRE (last visited March 10, 2016)). According to Petron's analysis, the correlation coefficient between the respective share prices of KRE and TierOne is 0.908, which Petron contends "suggests a strong positive linear relationship." Filing 206-1 at 6. Thus, Petron concludes, "one can assume that KRE represents a good market indicator for the movements of TierOne's stock." Filing 206-1 at 6. To account for the effects of general market forces on TierOne share prices, Petron performed additional loss calculation scenarios using the KRE.

In one scenario, Petron calculated the percent difference between TierOne's share price on the disclosure date, November 10, 2009, and TierOne's share price 5 trading days later, November 17, 2009. Filing 206-1 at 7, 29. TierOne share prices declined 48.54%. Filing 206-1 at 7, 29. Then, Petron performed the same comparison, but using KRE share prices instead

5

of TierOne share prices.[3] Filing 206-1 at 7, 29. KRE share prices increased 5.12% over the same time period. Filing 206-1 at 7, 29.

In another scenario, Petron calculated the percent difference between TierOne's average share price between and including September 2, 2008 and November 10, 2009, and TierOne's average share price for the 90 trading days following November 10, 2009. Filing 206-1 at 7, 29. He then repeated the calculation using KRE's average share prices. TierOne's average share price decreased 74.48% between the two periods, and KRE's average share price decreased 1.65%. Filing 206-1 at 7, 29. Reasoning that, therefore, general market forces likely accounted for a 1.65% decrease in TierOne's average share price between the two periods, Petron subtracted 1.65% from the 74.48% total decrease in TierOne's average share price. Filing 206-1 at 7, 29. This resulted in an adjusted decrease of 72.83%, which amounts to an adjusted shareholder loss totaling $35,799,239.00—about $800,000 less than the government's original estimate of loss. Filing 206-1 at 7, 29.

This new analysis, the government argues, "makes clear that there were no external market forces or changed economic circumstances that caused the decline in TierOne's stock during the 90-day period following the disclosure." Filing 206 at 5–6. The defendant, on the other hand, takes issue with Petron's analysis. He expects his expert witness, John Salomon, to testify at the sentencing hearing that the regional banks which make up the index KRE is based on "are not comparable to TierOne in significant respects." Filing 208 at 7. Salomon is expected to offer an analysis of "problem banks" that Salomon contends are more similarly situated to TierOne. Filing 208 at 7. According to the defendant, this analysis will reveal that the share prices of those banks "dropped between 70 and 90 percent, a reduction in line with the 74.48% decline in TierOne's stock." Filing 208 at 7.

The government further contends that the MRM "is a conservative measure of loss" because it takes into account only the losses TierOne suffered in the 90 days after the disclosure of the fraud. Filing 206 at 6. In support of this contention, the government points to another calculation Petron performed, which, according to the government, demonstrates that if the loss calculation were performed using the 5 trading days following the disclosure of the fraud, instead of the 90 trading days following, the estimate of loss would be much higher. Filing 206 at 6.

Finally, the government argues that even if the Court rejects the MRM, the "bare minimum" of shareholder loss must be at least $9,850,275—the

---

[3] Petron obtained the adjusted closing price data for KRE from *SPDR S&P Regional Banking ETF (KRE) Historical Prices*, Yahoo! Finance, https://finance.yahoo.com/q/hp?s=KRE+Historical+Prices (last visited March 10, 2016).

total loss sustained by identified TierOne shareholders who purchased stock between September 2, 2008 and November 10, 2009. Filing 206 at 6.

### *(iv) The Court's tentative findings*

For the purpose of performing the MRM calculation, the Court tentatively finds that the period of fraud is from May 21, 2009 to November 9, 2009, and the date of disclosure is November 10, 2009. The Court further tentatively finds that in performing the MRM calculation, 16,950,290 is an appropriate estimate for the number of outstanding shares. The Court tentatively concludes that the resulting loss estimate is reasonable and accounts for the effect of factors other than the defendant's fraud on TierOne's stock prices.[4]

First, the Court tentatively finds that the period of fraud began on May 21, 2009, rather than September 2, 2008. As the defendant points out, the government has produced no evidence that the defendant made fraudulent statements, or fraudulently omitted to disclose information to shareholders, until the May 21, 2009 shareholder's meeting. Accordingly, any actions of the shareholders prior to May 21, 2009 would not have been taken in reliance on the defendant's fraudulent statements or omissions.

Additionally, the Court tentatively finds that November 10, 2009 is the date that the fraud was disclosed to shareholders. The Court acknowledges that the government's evidence is somewhat inconsistent as to whether the fraud was disclosed to shareholders on November 5 or November 10, 2009. Government's Exhibit 723 is a Form 8-K that TierOne filed on November 10, 2009. In it, TierOne reports that on November 5, 2009, it filed its quarterly Thrift Financial Report with the Office of Thrift Supervision and that "[t]he TFR reflected a loss provision of approximately $120.2 million."

The question of when the fraud was disclosed to shareholders depends, then, on whether the Thrift Financial Report informed shareholders of TierOne's true financial state before the Form 8-K did. The government produced some evidence suggesting it did: specifically, at trial, Lundstrom and Laphen both agreed that November 5 was the first time TierOne disclosed $120 million in losses to the investing public. T2288; T649. But other evidence suggests that the Thrift Financial Report was not available to shareholders, and that they were informed of those losses by the Form 8-K instead. To begin with, Lundstrom testified that "[a]n 8-K is that press release regarding disclosure to the shareholders." T2072. Similarly, Steven

---

[4] The Court expressly rejects the defendant's suggestion that his gain, rather than the victims' losses, is a preferable way to assess his misconduct. Filing 196 at 14. The defendant's breach of the trust that others placed in him is best measured by their losses.

7

Grey, an investor in TierOne, testified, "Whenever there's any kind of material news, which material means—and investors would want to know, the company has to file an 8-K and announce it." T1436. Thus, it is apparent that the Form 8-K, and not the Thrift Financial Report, was the standard vehicle for making disclosures to shareholders.

The testimony of shareholders reinforces this conclusion. First, Steven Grey testified that he purchased shares in TierOne on behalf of a trust on November 6, but that he declined to purchase additional shares after receiving the Form 8-K on November 10. T1506. He testified that the Form 8-K "was really the first signal that we had that something was amiss," and that he did not purchase more shares after November 10 because the Form 8-K "was a clear signal that something was going on." T1505–06. Second, Bruce Hudson, another a TierOne shareholder, testified that the Form 8-K is what prompted him to sell his shares on November 11. T868. Finally, the fact that TierOne's share prices increased between November 5 and November 10 (from $1.50 to $1.71), before dropping sharply on November 11 (to $1.07), suggests that shareholders first learned TierOne's true financial state on November 10.[5] Thus, the Court tentatively finds that while November 5, 2009 may have been the date the fraud was disclosed to the OTS, November 10, 2009 was the date the fraud was disclosed to shareholders. Because it is shareholder loss the Court is calculating, November 10 is the relevant disclosure date for purposes of the MRM.

Next, the Court tentatively finds that the period of time between and including May 21, 2009 to November 9, 2009 constitutes the fraud period. The government's expert uses the adjusted closing price of TierOne's shares to calculate the average share prices before and after the fraud was disclosed. Though the government did not produce evidence demonstrating what time on November 10 TierOne issued the Form 8-K, it is reasonable to assume that it did so before the stock market closed. Thus, TierOne's share price at closing on November 10 was a post-disclosure price, and November 10 should not be counted as part of the fraud period.

Finally, the Court tentatively finds—subject to reevaluation based on evidence offered at the sentencing hearing—that Petron's estimate of 16,950,290 for the average number of shares outstanding is appropriate to use as a multiplier. The defendant argues that the Court should exclude those shares which were not actively traded, such as the shares owned by directors and executives. Filing 207 at 7. The defendant has not yet produced

---

[5] TierOne price data from *TONEQ History Information*, StockMarketWatch, http://thestockmarketwatch.com/stock/stock-data.aspx?stock=TONEQ&A=showHistory (last visited March 10, 2016).

8

evidence that those shareholders would have retained their stock even if they knew TierOne's true financial state. And in the absence of such evidence, it is reasonable to assume instead that they would have behaved as rational economic actors. But the defendant has expressed his intention to offer evidence on this point at the sentencing hearing, filing 208 at 8, and the Court will fully consider that evidence.

With these tentative findings in mind, the Court has tentatively calculated a new loss estimate using the MRM. The average price of TierOne shares between and including May 21, 2009 and November 9, 2009 is $2.40.[6] The average price of TierOne shares in the 90 calendar days following November 9[7] is $0.80. The difference between the two is $1.60. That number, multiplied by 16,950,290, results in a loss estimate of $27,120,464.00. This corresponds to an offense-level increase of 22. U.S.S.G. § 2B1.1(b)(1)(L).

Next, the Court must evaluate whether the MRM provides "a reasonable estimate of the actual loss," taking into consideration "the extent to which the amount so determined includes significant changes in value not resulting from the offense." U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). The Court tentatively concludes—subject to reevaluation based on any evidence offered at the sentencing hearing—that the MRM is a reasonable estimate of the shareholder loss.

First, the Court tentatively finds that this loss calculation adequately accounts for the extent to which shareholder losses may be attributable to TierOne's investment decisions. The defendant argues that TierOne's share prices decreased largely because the housing crisis weakened the ability of borrowers to pay back their loans and diminished the value of the collateral securing those loans. Filing 207 at 5. But the defendant's fraud did not cause shareholders to lose money by decreasing the value of TierOne's shares; it caused them to lose money by inducing them to purchase or retain shares based on information that grossly overestimated the value of those shares. To illustrate, imagine that a defendant sold a victim a car for $1,000, but

---

[6] The average price of TierOne shares for each period was calculated by taking the mean of the adjusted closing prices of each day within the relevant period. TierOne share price data from *TONEQ History Information*, StockMarketWatch, http://thestockmarketwatch.com/stock/stock-data.aspx?stock=TONEQ&A=showHistory (last visited March 10, 2016).

[7] This period runs between and including November 10, 2009 and February 8, 2010. The government uses the 90 *trading* days following the disclosure of the fraud in its MRM. *See* Filing 206-1 at 3,13. But the Guidelines suggest using "the 90-day period after the fraud was disclosed to the market." U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). Generally, in the federal courts, the word "days," without a preceding modifier, refers to actual calendar days, including weekends and holidays. *See e.g.* Fed. R. Crim. P. 45(a)(1). Accordingly, the Court's tentative MRM calculation uses calendar days rather than trading days.

9

fraudulently failed to disclose that the car had some serious mechanical defect, which decreased the value of the car to $500. The victim's loss would be measured by the difference between the price paid ($1,000) and the value received ($500). It would be no defense to that loss calculation to say that the victim's loss was actually caused by the mechanical defect—the object of the fraud was to misrepresent the value of what was sold. And that was also the object of the fraud here. Accordingly, the Court tentatively finds that the fact that the value of TierOne stock was adversely affected by TierOne's real estate investments does not preclude assessing shareholder losses attributable to the fraud.

Second, the Court tentatively finds—subject to reevaluation based on evidence offered at the sentencing hearing—that this calculation adequately accounts for any possible effect of general market forces on TierOne share prices. The government has offered evidence that the banking industry—as represented by the KRE—experienced some measure of recovery during the same time period in which TierOne's share prices dropped. *See* Filing 206-1 at 6–7. However, the defendant expects to offer evidence that banks similarly situated to TierOne "dropped between 70 and 90 percent, a reduction in line with the 74.48% decline in TierOne's stock." Filing 208 at 7. Accordingly, the Court tentatively finds that the MRM adequately accounts for the effect of general market forces, subject to reevaluation after hearing the defendant's evidence at the sentencing hearing.

Third, the Court tentatively finds that the difference between this estimate of shareholder loss and amount sought by the government for restitution does not affect the reasonability of the estimate. The defendant argues that the two amounts should be closer together. Filing 207 at 3. But although both figures represent shareholder loss, they are calculated in different ways because they serve different purposes. The Guidelines require an estimate of shareholder loss as one factor in determining the seriousness of the offense conduct. Like the other portions of the Guidelines, this is meant to assist courts in fashioning uniform, proportionate sentences. Accordingly, though a "reasonable estimate" of the loss is required, it is not necessary to specifically prove the actual harm suffered by each victim. *See* U.S.S.G. § 2B1.1, cmt. n.3(F)(ix). Restitution, on the other hand, is compensatory rather than punitive. *United States v. Chaika*, 695 F.3d 741, 748 (8th Cir. 2012). In a fraud case, it is limited to the actual loss directly caused by the defendant's criminal conduct in the course of the scheme alleged in the indictment. *Id.* And the amount cannot exceed the actual, provable loss realized by the victims. *United States v. Martinez*, 690 F.3d 1083, 1088 (8th Cir. 2012). Thus, the Court tentatively finds that the shareholder loss estimate may be reasonable even if it exceeds the amount sought for restitution.

Finally, the Court tentatively finds that the use of the MRM in this case does not violate the *Ex Post Facto* Clause. The recommended use of the MRM is included in the 2015 version of the Sentencing Guidelines Manual, but is not included in the 2008 version—the version in effect during the defendant's offense conduct. Thus, the defendant argues, using the MRM would violate the *Ex Post Facto* Clause. Filing 196 at 13.

According to the Guidelines, "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11. But if doing so "would violate the *Ex Post Facto* Clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." *Id*. The *Ex Post Facto* Clause is violated when a defendant is sentenced under Guidelines promulgated after his commission of the offense, and the use of those new Guidelines creates a "sufficient risk of increasing the measure of punishment attached to the covered crimes." *Peugh v. United States*, 133 S. Ct. 2072, 2082 (2013). Whether "a change in law creates such a risk is a matter of degree; the test cannot be reduced to a single formula." *Id.* (quoting *California Dep't of Corr. v. Morales*, 514 U.S. 499, 509 (1995)) (internal quotations omitted). But mere "speculation or conjecture that a change in law will retrospectively increase the punishment for a crime will not suffice to establish a violation of the *Ex Post Facto* Clause." *Id*.

Here, the Court tentatively finds that the defendant has provided no more than "speculation or conjecture" that use of the MRM will increase the punishment for his crimes. *See id.* The difference between the 2008 Guidelines and the 2015 Guidelines is that the 2008 version does not specifically mention the MRM as a possible method of calculating loss, while the comments contained in the 2015 version do. But under either set of Guidelines, the Court is required to make a "reasonable estimate" of the loss. And under either set of Guidelines, the Court could—without deviating from those Guidelines—use the MRM or any other method to make this estimate. The MRM was, in fact, utilized by courts to calculate shareholder losses well before it was incorporated, from that caselaw, into the Guidelines. *E.g. Brown*, 595 F.3d at 525 n.30. Accordingly, the Court tentatively finds that the use of MRM does not create a "sufficient risk of increasing the measure of punishment" for the defendant's crimes, and does not violate the *Ex Post Facto* Clause. *See Peugh*, 133 S. Ct. at 2082.

To summarize: the Court *tentatively* finds, subject to the evidence presented at sentencing, that the fraud period for the offense of securities fraud extends from May 21, 2009 to November 9, 2009, that the fraud was disclosed on November 10, 2009, and that $27,120,464.00 in shareholder losses are attributable to that fraud.

(b) FDIC Loss

The government also argues that the losses suffered by the FDIC should be added to the loss calculation. Filing 206 at 7. The FDIC estimates its losses at $17,171,154.00. *See* filing 207-2. To explain how the FDIC incurred these losses, the government has submitted the declaration of Douglas W. Pittman of the Office of the Comptroller of the Currency (filing 206-2). According to Pittman, he was an OTS field manager "involved in the recommendation for OTS to close TierOne Bank." Filing 206-2 at 1. Pittman states that TierOne was closed in June 2010, and that the FDIC was appointed as TierOne's receiver. Filing 206-2 at 1. Pittman asserts that the decision to close the bank and appoint a receiver was "motivated by multiple factors." Filing 206-2 at 1. According to the OTS's recommendation for the appointment of the FDIC as receiver, those factors include insufficient capital, alleged fraud and mismanagement, and deterioration of asset quality. Filing 206-2 at 175–76.

The government contends that after the FDIC was appointed receiver, it entered into a loss-sharing agreement with Great Western Bank. Filing 206 at 7. Great Western Bank agreed to purchase a majority of TierOne's loan portfolio, and in exchange, the FDIC agreed to reimburse Great Western Bank for any losses it might incur on those loans. Filing 206-1 at 4. The government argues that a large portion of the FDIC's total losses resulted from this loss-sharing agreement.[8] Filing 206 at 7.

According to Petron, some of the loans that were subject to the loss-sharing agreement were referenced in the "Best/Expected/Worst Case document" (Exhibit 2) the government offered at trial. Filing 206-1 at 5. During trial, the government elicited testimony that the Best/Expected/Worst case document was created for internal use at TierOne, and contained a loan-by-loan analysis of TierOne's problem assets. T439–40. The government relied on this document to establish that the defendant was aware TierOne's investments were worth less than TierOne represented to shareholders and regulators. *See* T2376. The government contends that some of the FDIC's losses from the loss-sharing agreement resulted from loans referenced in the Best/Expected/Worst Case document. Filing 206 at 7. Thus, according to the government, "there is a direct connection between the specific losses

---

[8] The defendant argues that the government has not produced sufficient evidence that the $17,171,154.00 figure represents the FDIC's actual losses, or that the losses resulted from the loss-sharing agreement. Filing 207 at 8–9. The Court assumes without deciding for the purposes of its analysis that this figure does represent the FDIC's losses from the loss-sharing agreement.

concealed by the defendant and his co-conspirators and the $17 million figure submitted by the FDIC." Filing 206 at 7.

For the FDIC's losses to be attributable to the defendant's fraud, the government must establish that the fraud, rather than the poor quality of the investments themselves, caused the FDIC's losses. In other words, the government must present evidence that the FDIC's specific losses could have been prevented had the defendant not fraudulently misrepresented the value of its investments. The government has not yet produced evidence establishing this causal relationship. Thus, subject to reevaluation based on evidence offered at the sentencing hearing, the Court tentatively finds that the FDIC's losses were not caused by the defendant's fraud.[9]

## 2. 25 OR MORE VICTIMS

The RPIR concludes that 25 or more victims experienced substantial financial hardship as a result of the defendant's fraud, and assesses the defendant an offense level increase of 6. The defendant objects to this assessment, arguing that the government has not proven by a preponderance of the evidence that there were 25 or more victims, or that those victims experienced substantial financial harm. Filing 196 at 15–16.

Under the Guidelines, where a defendant is convicted of a fraud offense, the offense level increases based on the number of victims of the fraud. U.S.S.G. § 2B1.1(b)(2). If there are 10 or more victims, or if there is at least one victim who suffered "substantial financial hardship" as a result of the fraud, the increase is 2 levels. *Id.* If 5 or more victims suffered substantial financial hardship, the increase is 4 levels. *Id.* And if 25 of more victims suffered substantial hardship, the increase is 6 levels. *Id.*

To determine whether a victim has suffered "substantial financial hardship," the Court is to consider a variety of factors, including whether the victim became insolvent, filed for bankruptcy, suffered "substantial loss of a retirement, education, or other savings or investment fund," "mad[e] substantial changes to his or her employment" or living arrangements, or suffered "substantial harm to his or her ability to obtain credit." U.S.S.G. § 2B1.1, cmt. n.4(F).

---

[9] The Court does, however, reject the defendant's argument that the FDIC's losses, if proved at sentencing to have resulted from the defendant's fraud, cannot be aggregated with shareholder losses for purposes of loss calculation. Filing 196 at 13. The FDIC's losses resulted from the difference between TierOne's liabilities and the value of its assets. The shareholders' losses resulted from the defendant's concealment of that difference. None of the FDIC's losses went to compensate shareholders for their lost investment; the two categories are, as Petron averred, "mutually exclusive." Filing 206-1 at 10.

The evidence from trial does establish that the fraud had 10 or more victims, at least one of whom—Bruce Hudson—suffered a significant financial hardship. T869-70. So, the evidence at present warrants at least a 2-level enhancement. But the government has not yet presented evidence establishing that at least 5 victims, or 25 or more victims, experienced "substantial financial hardship" as defined by the Guidelines. The Court will resolve the defendant's objection after hearing any evidence the government presents on this point at the sentencing hearing, keeping in mind the principles set forth above.

### 3. SOPHISTICATED MEANS

The RPIR assesses the defendant an offense level increase of 2 under U.S.S.G. § 2B1.1(b)(10)(C) on the grounds that the offense involved "sophisticated means" and the defendant "intentionally engaged in or caused the conduct constituting sophisticated means." The defendant objects to this increase, arguing that the fraud was fairly straightforward, and at least no more complicated than other cases of securities fraud. Filing 196 at 17.

According to the Guidelines, "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, cmt. n.9(B). This type of conduct includes, for example, "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." *Id.*

The defendant contends that his offense conduct does not rise to the level of the examples provided in the Guidelines. Rather, he argues that his conduct boils down to "[m]aking false statements and misrepresentation," which "is inherent in any securities fraud case and not of the type deserving this enhancement." Filing 196 at 18.

But the evidence adduced at trial indicates several instances in which the defendant used unusually complex methods to hide TierOne's losses. It showed that the defendant did not merely make false statements about the true value of TierOne's investments; rather, he took several intricate steps to conceal their value, including: delaying appraisals, *see* T260–61, guarding internal analysis of problem assets, *see* T1136–37, and altering board meeting minutes, *see* T1377, among others. Accordingly, the Court tentatively finds that the defendant used sophisticated means in the commission of the offense.

### 4. SAFETY AND SOUNDNESS OF FINANCIAL INSTITUTION

Next, the RPIR increases the defendant's offense level by 2 under U.S.S.G. § 2B1.1(b)(16)(B) and (C), on the grounds that the offense "substantially jeopardized the safety and soundness of a financial

institution." The defendant does not dispute that TierOne's safety and soundness were "substantially jeopardized"—TierOne did fail. But the defendant argues that TierOne's failure was caused not by his fraud, but by the effect of the housing crisis and economic downturn on TierOne's investments. Filing 196 at 20–21.

For a defendant's fraud to substantially jeopardize the safety and soundness of a financial institution, there must be some causal connection between the fraud and the jeopardy to the institution. *United States v. Young,* 413 F.3d 727, 732 (8th Cir. 2005). However, the defendant's conduct need not have been the *sole* cause of the jeopardy the financial institution experienced. *Id.* Moreover, the defendant's conduct need only have caused substantial *jeopardy,* as opposed to actual failure, for the enhancement to apply. *See United States v. Zech,* 553 F.3d 663, 667 (8th Cir. 2009). For instance, a financial institution has been substantially jeopardized if the defendant's fraud forced it to make "extraordinary efforts" to survive. *Id.*

Here, it is indisputable that the bank would have lost a substantial amount of money regardless of whether the defendant fraudulently misrepresented its true financial state. But whatever opportunity TierOne may have had to mitigate its losses was sacrificed by the defendant's scheme to conceal them. Thus, the Court tentatively finds that although the defendant's fraud was not the sole cause of TierOne's failure, it did substantially jeopardize TierOne's safety and soundness.

### 5. ROLE IN THE OFFENSE

The RPIR increases the defendant's offense level by 4 under U.S.S.G. § 3B1.1(a) on the basis of its conclusion that the defendant was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The defendant objects to this enhancement for four reasons. First, the defendant argues that the government has produced insufficient evidence he had a leadership role in the criminal activity. Filing 196 at 21. Second, the defendant argues that there is no evidence the criminal activity involved five or more participants. Filing 196 at 22. Third, the defendant argues that this enhancement should not apply to him because he is unlikely to recidivate. Filing 196 at 23. Fourth, the defendant argues that applying this enhancement to him would constitute "double-counting" under the Guidelines. Filing 196 at 24.

First, the defendant argues that there is insufficient evidence that he had a leadership role in the criminal activity. Filing 196 at 21. According to the Guidelines,

15

> [i]n distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

U.S.S.G. § 3B1.1, cmt. n.4.

The defendant argues that although he was the CEO of TierOne, there is no evidence suggesting he "directed" other employees to participate in the criminal activity. Filing 196 at 21. However, the Court tentatively finds that the evidence adduced at trial demonstrates that the defendant had a leadership role in the criminal activity. While the title of "CEO" is not dispositive, the defendant's position empowered him to exercise significant "control and authority" over others in carrying out his crimes. For example, Don Langford testified that Gale Furnas told him that it was the defendant and Jim Laphen who decided that TierOne should delay appraisals. T1069. According to Langford and David Frances, in discussions about delaying the appraisals, Furnas often referred to himself as a "monkey on a string," who merely carried out the orders of the defendant and Laphen. *See id.*; T913. Similarly, the evidence at trial demonstrates that the defendant directed Judy Klinkman to alter the board minutes, T1377, that the defendant directed Langford to produce the Best/Expected/Worst case document, T1106–07, and that the defendant directed TierOne employees to take measures to hide losses. T400–04, 606–07.

Second, the defendant argues that there is no evidence the criminal activity involved five or more participants. Filing 196 at 22. But for the reasons set forth in the Court's memorandum and order (filing 129) issued pursuant to *United States v. Bell*, 573 F.2d 1040, 1044 (8th Cir. 1978), the Court tentatively finds that there were at least five co-conspirators: the defendant, Jim Laphen, Gene Witkowicz, Gale Furnas, and Don Langford.

Third, the defendant argues that this enhancement should not apply to him because § 3B1.1 is intended to apply to those who profit more from the offense, and are more likely to recidivate. Filing 196 at 23. The Guidelines commentary does mention these concerns. U.S.S.G. § 3B1.1, cmt. n.4. And according to the defendant, he did not profit from his offense, and presents no

risk of recidivism. Filing 196 at 23. However, the commentary also provides that "[t]his adjustment is included primarily because of concerns about relative responsibility." *Id.* Accordingly, while the Court will consider all of the above Guidelines commentary, the Court nonetheless tentatively finds that applying this enhancement to the defendant's conduct is in accordance with the intended purpose of the enhancement.

Fourth, the defendant argues that applying this enhancement to him would constitute "double-counting" under the Guidelines. Filing 196 at 24. The defendant notes that the government also seeks to apply a 4-level sentencing enhancement pursuant to U.S.S.G. § 2B1.1.(19)(A) on the basis that the offense involved a securities law violation, and the defendant was an officer or director of a publicly traded company. Filing 196 at 24. Thus, the defendant argues, applying both enhancements punishes the defendant twice for the same harm. Filing 196 at 24.

A court has engaged in double-counting when "one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines." *United States v. Pena,* 339 F.3d 715, 719 (8th Cir. 2003) (quoting *United States v. Hipenbecker,* 115 F.3d 581, 583 (8th Cir. 1997)) (internal quotations omitted). However, "a district court does not double count for purposes of the Guidelines by enhancing an offense level for two or more reasons when those reasons 'address conceptually separate sentencing notions.'" *United States v. Zech,* 553 F.3d 663, 668 (8th Cir. 2009) (quoting *United States v. Phillips,* 506 F.3d 685, 688 (8th Cir. 2007)).

Here, the Court tentatively finds that U.S.S.G. § 3B1.1(a) serves a purpose distinct from that served by U.S.S.G. § 2B1.1(b)(19)(A). The former, as discussed above, "is included primarily because of concerns about relative responsibility." U.S.S.G. § 3B1.1(a). In other words, it is meant to account for differing degrees of culpability for different participants in the same criminal activity. The latter, on the other hand, is clearly intended to account for the harm that results when a person in a position of public trust violates that trust and undermines the integrity of the stock market. *See* U.S.S.G. § 2B1.1, cmt. n.15(C) (explaining that if § 2B1.1(b)(19)(A) is applied, § 3B1.3, a sentencing enhancement based on abuse of position of trust or use of a special skill, should not be). In sum, the Court tentatively finds that U.S.S.G. § 2B1.1(b)(19)(A) applies to the defendant's conduct.

### 6. OTHER OBJECTIONS

Finally, the defendant objects to "the many unsupported, unproven, and factually inaccurate statements in the PSR." Filing 196 at 24. For example, the defendant objects to the inclusion of allegations from the

indictment and from civil lawsuits. Filing 196 at 24. The defendant urges the Court to "make its determinations at sentencing based on actual evidence and not unsupported assertions." Filing 196 at 24. The Court was the trial judge in this case, and is familiar with the evidence presented at trial. The Court will make its final sentencing determination on the basis of that evidence, along with any additional evidence that has been or will be presented by the parties for the purpose of sentencing.

## II. MOTION FOR DOWNWARD DEPARTURE/VARIANCE

The defendant has moved for a downward departure or variance from the Guidelines, contending that such a variance would comport with the purposes of 18 U.S.C. § 3553(a). Filing 198 at 1. First, the defendant argues that his personal history and characteristics justify a variance; specifically, he points to his "exemplary character," charitable contributions, and medical condition. Filing 198 at 3. Second, he argues a significant variance is warranted on the basis of the nature and circumstances of the offense: specifically, he argues that he did not act for his own personal gain, that he has already been penalized financially and reputationally, that there was a long delay between the conspiracy and the indictment, and that the losses caused by his conduct were substantial, but diffuse. Filing 198 at 13–16. Third, he contends that a sentence within the Guidelines will be overly harsh, because there is no risk that he will recidivate, because similarly-situated defendants can be deterred with a sentence below the Guidelines, and because he has significant medical issues. Filing 198 at 17–19. Fourth, he argues that the Court has discretion in imposing alternatives to imprisonment that will accomplish the objections of § 3553(a). Filing 198 at 19. And finally, he contends that a downward departure will avoid unwarranted sentence disparities, because courts generally grant a below-Guidelines sentence in cases of this type. Filing 198 at 21. The Court will fully consider all of these factors at the sentencing hearing in fashioning an appropriate sentence that fulfills the purposes of § 3553(a).

IT IS ORDERED:

1. The Court will consult and follow the Federal Sentencing Guidelines to the extent permitted and required by *United States v. Booker*, 543 U.S. 220 (2005) and subsequent cases. Unless otherwise ordered, the Court will:

    (a) give the advisory Guidelines respectful consideration within the context of each individual case and will filter the

Guidelines' advice through the 18 U.S.C. § 3553(a) factors, but will not afford the Guidelines any particular or "substantial" weight;

(b) resolve all factual disputes relevant to sentencing by the greater weight of the evidence and without the aid of a jury;

(c) impose upon the United States the burden of proof on all Guidelines enhancements;

(d) impose upon the defendant the burden of proof on all Guidelines mitigators;

(e) depart from the advisory Guidelines, if appropriate, using pre-*Booker* departure theory; and

(f) in cases where a departure using pre-*Booker* departure theory is not warranted, deviate or vary from the Guidelines when there is a principled reason justifying a sentence different than that called for by application of the advisory Guidelines, again without affording the Guidelines any particular or "substantial" weight.

2. Except to the extent, if any, that the Court has sustained an objection, granted a motion, or reserved an issue for later resolution in the preceding paragraph, the parties are notified that the Court's tentative findings are that the RPIR is correct in all respects.

3. If any party wishes to challenge these tentative findings, that party shall, as soon as possible (but in any event no later than three (3) business days before sentencing) file with the Court and serve upon opposing counsel an objection challenging these tentative findings, supported by a brief as to the law and such evidentiary materials as are required, giving due regard to the local rules of practice governing the submission of evidentiary materials. If an evidentiary hearing is requested, such filings should include a statement describing why a hearing is necessary and how long such a hearing would take.

4. Absent timely submission of the information required by the preceding paragraph, the Court's tentative findings may become

final and the RPIR may be relied upon by the Court without more.

5. Unless otherwise ordered, any objection challenging these tentative findings shall be resolved at sentencing.

Dated this 14th day of March, 2016.

BY THE COURT:

*John M. Gerrard*

John M. Gerrard
United States District Judge